1
2
3
4
5
6
7
8

# UNITED STATES DISTRICT COURT

9

## SOUTHERN DISTRICT OF CALIFORNIA

10
11
12

CHRISTOPHER CHARLES ALEXANDER
CLACK, CDCR #F-98816,

                          Plaintiff,

13
14
15
16
17

vs.

18
19

DEPUTY WILLIAM LATIMER #3275;
DEPUTY HOENIG, #2840,
SAN DIEGO COUNTY SHERIFF'S
DEPARTMENT,

20

                          Defendants.

21
22

Civil No.    08-0624 IEG (RBB)

**ORDER:**

**1)  DISMISSING DEFENDANT
HOENIG FOR FAILURE TO
PROSECUTE AND FOR FAILURE
TO STATE A CLAIM PURSUANT
TO Fed.R.Civ.P. 4(m),
28 U.S.C. §§ 1915(e)(2)
AND 1915A(b)**

**AND**

**2)  GRANTING IN PART
AND DENYING IN PART
DEFENDANTS' MOTION
FOR SUMMARY JUDGMENT
PURSUANT TO Fed.R.Civ.P. 56(c)**

**[Doc. No. 28]**

23

## I.       Procedural Background

24
25
26

Christopher Charles Alexander Clack ("Plaintiff"), currently incarcerated at Centinela
State Prison, is proceeding in pro se and *in forma pauperis* with this civil rights action filed
pursuant to 42 U.S.C. § 1983.

27
28

1    Plaintiff claims the San Diego County Sheriff's Department and two of its deputies

2  violated his Eighth Amendment rights on March 29, 2007 at the San Diego Central Jail.  Plaintiff

3  seeks injunctive relief as well as general and punitive damages.

4    On April 22, 2009, the County of San Diego and Deputy Latimer ("Defendants") filed

5  a Motion for Summary Judgment pursuant to FED.R.CIV.P. 56 [Doc. No. 28].  On April 24,

6  2009, the Court provided Plaintiff with written notice of the requirements for opposing summary

7  judgment pursuant to *Rand v. Rowland*, 154 F.3d 952 (9th Cir. 1998) (en banc) and *Klingele v.

8  Eikenberry*, 849 F.2d 409 (9th Cir. 1988) [Doc. No. 29].  Plaintiff has filed an Opposition [Doc.

9  No. 35], to which Defendants have filed a Reply [Doc. No. 33].

10  **II.    Proper Parties**

11    First, the Court notes that Plaintiff named the San Diego County Sheriff's Department

12  as a defendant in error; it is the County of San Diego which has accepted service, has appeared

13  and has answered as the appropriate entity subject to suit under 1983.  *Miranda v. Clark County,

14  Nev.*, 319 F.3d 465, 469 (9th Cir. 2003) (en banc) (counties are "persons" subject to suit under

15  § 1983); *cf. Vance v. County of Santa Clara*, 928 F .Supp. 993, 995-96 (N.D. Cal. 1996)

16  ("persons" do not include municipal departments, therefore "[n]aming a municipal department

17  as a defendant is not an appropriate means of pleading a § 1983 action against a municipality.").

18    In addition, Plaintiff's Complaint names San Diego County Sheriff's Deputy Hoenig as

19  a Defendant.  Plaintiff claims Defendant Hoenig "aided and abetted" Deputy Latimer.  (Compl.

20  at 5.)  However, the United States Marshal attempted, but was unable to execute service upon

21  Hoenig at the address provided by Plaintiff [Doc. No. 9], and nothing in the docket indicates

22  Plaintiff ever provided the Marshal with an updated address.  Therefore, because Hoenig has

23  never been served, the Court has no personal jurisdiction over him and he is not a party to this

24  action.  *See* FED.R.CIV.P. 4(m); *Murphy Bros., Inc. v. Michetti Pipe Stringing, Inc.*, 526 U.S.

25  344, 350 (1999) ("In the absence of service of process (or waiver of service by the defendant),"

26  under FED.R.CIV.P. 4, "a court ordinarily may not exercise power over a party the complaint

27  names as a defendant." ); *see also Omni Capital Int'l, Ltd. v. Rudolf Wolff & Co.*, 484 U.S. 97,

28

104 (1987) ("Before a ... court may exercise personal jurisdiction over a defendant, the procedural requirement of service of summons must be satisfied.").

Even if Plaintiff had served Deputy Hoenig, however, his Complaint fails to state a claim against him. *See* 28 U.S.C. §§ 1915(e)(2), 1915A(b); *Lopez v. Smith*, 203 F.3d 1122, 1126-27 (9th Cir. 2000) (en banc) (noting that 28 U.S.C. § 1915(e) "not only permits but requires" the court to sua sponte dismiss an *in forma pauperis* complaint that fails to state a claim); *Resnick v. Hayes*, 213 F.3d 443, 446 (9th Cir. 2000) (discussing sua sponte screening required in prisoner cases by 28 U.S.C. § 1915A(b)). Plaintiff's only allegation against Hoenig is that he violated Plaintiff's right to be free from cruel and unusual punishment.[1] (Compl. at 5.)

A pretrial detainee's claim for unconstitutional conditions of confinement arises from the Fourteenth Amendment Due Process Clause rather than from the Eighth Amendment prohibition against cruel and unusual punishment. *Bell v. Wolfish*, 441 U.S. 520, 535 (1979). Nevertheless, the same standards are applied, requiring proof that the defendant acted with deliberate indifference. *See Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998).

Jail officials, like Hoenig, have a duty to protect inmates from violence. *See Farmer v. Brennan*, 511 U.S. 825, 833 (1994); *Robins v. Meecham,* 60 F.3d 1436, 1442 (9th Cir. 1995) (deliberate indifference standard applies when guards fail to intervene in attacks by other guards); *Redman v. County of San Diego*, 942 F.2d 1435, 1442 (9th Cir. 1991) (en banc) ("[D]eliberate indifference" is the level of culpability pretrial detainees must establish to maintain a failure to protect claim under the Fourteenth Amendment).

Thus, to state a failure to protect claim against Deputy Hoenig Plaintiff must allege that Hoenig was "deliberately indifferent," i.e., that he was aware of, but nevertheless consciously disregarded an excessive risk to Plaintiff's health or safety. *Farmer*, 511 U.S. at 834. Plaintiff

---

[1]    Plaintiff also refers to his right to "freedom from association," however, nothing in his Complaint could plausibly support such a claim. *See Gerber v. Hickman*, 291 F.3d 617, 621 (9th Cir. 2002) (en banc) (noting that during incarceration, "the right of intimate association, 'a fundamental element of personal liberty,' is necessarily abridged.") (quoting *Roberts v. United States Jaycees*, 468 U.S. 609, 618 (1984)). Moreover, the right protects only the "kinds of relationships 'that attend the creation and sustenance of a family-marriage, childbirth, the raising and education of children, and cohabitation with one's relatives....'" *Roberts*, 468 U.S. at 619. Without more, "the loss of the right to intimate association is simply part and parcel of being imprisoned." *Gerber*, 291 F.3d at 621.

1   claims Deputy Hoenig "told him to stop eating and board the bus immediately," and assisted

2   Deputy Latimer in placing hand cuffs on him.  (Compl. at 11; Pl.'s Dep. at 43, 47-49.)

3   However, Plaintiff does not allege that Hoenig did anything that might rise to the level of

4   "deliberate indifference" and  no evidence in the record on summary judgment supports such a

5   claim.  *See Redman*, 942 F.2d at 1442; *Farmer*, 511 U.S. at 833.

6        Thus, the Court dismisses Plaintiff's claims against Deputy Hoenig for insufficient

7   service, lack of personal jurisdiction and for failing to state a claim upon which § 1983 relief can

8   be granted.  *See* FED.R.CIV.P. 4(m); 28 U.S.C. §§ 1915(e)(2), 1915A(b).

9   **III.    Factual Background**

10       **A.    Undisputed Facts**

11       On March 29, 2007, Plaintiff, who was at the time charged with aiding and abetting a

12  robbery, was transported from George Bailey Detention Facility to the San Diego Central Jail

13  in order to attend a court proceeding in San Diego Superior Court.  (Compl. at 1, 11

14  (Complainant's sworn "Description of Incident" dated July 19, 2007); Defs.' Ex. 1, Plaintiff's

15  Deposition [hereafter "Pl.'s Dep."] at 41-43.)[2]  After a detainee has made a court appearance,

16  San Diego County Sheriff's Department deputies escort them back to the Central Jail.  Detainees

17  are then provided with dinner, which they eat in a holding cell together, before being transported

18  by bus back to George Bailey.  (Defs.' Ex. 2, Decl. Sgt. Jayson Kamoss [hereafter 'Kamoss

19  Decl.'] ¶¶ 3, 5.)

20

21

22  [2]    Because Plaintiff objects to the admissibility of his deposition testimony pursuant to FED.R.CIV.P.
    30(e) in his Opposition, the Court will not rely on his deposition when deciding whether triable issues
23  of fact exist.  It will, however, refer to that testimony while setting forth the factual allegations when
    they are consistent with Plaintiff's prior sworn statement, *see* Compl. at 11-12 ("Sworn Statement of
24  Complainant"), his post-deposition sworn statements submitted in opposition to Defendants' Motion
    (*see* Pl.'s Opp'n at 11-13 ["Sworn Statement of Plaintiff" #1 & #2]), the affidavits of Defendant Latimer
25  and Sgt. Kamoss (Defs.' Exs. 2-3), and the DVD of the incident lodged by Defendants in support of
    their Motion (Defs.' Ex. 4).  *See Leslie v. Grupo ICA*, 198 F.3d 1152, 1160-61 (9th Cir. 1999) (party's
26  consistent deposition testimony and sworn declaration supporting his claim and explaining inconsistent
    unsworn statements must be credited at the summary judgment stage).  The Court notes, however, that
27  the DVD of the incident, like the surveillance tape in *Lolli v. County of Orange*, 351 F.3d 410 (9th Cir.
    2003), "is a mute series of essentially still images from a number of angles" in which the parties are
28  often far away, obscured from view and which "does not clearly show [Plaintiff] resisting or whatever
    force the officers may have applied to him."  *Id.* at 412 n.1.

### B.    Plaintiff's Version of Events

On March 29, 2007, Plaintiff claims he was one of the last detainees to finish in court. When he finished and was placed in a holding cell, he was handed a dinner tray, but shortly after, Sheriff's deputies began removing people from the cell in order to begin boarding the bus. (Compl. at 11; Pl.'s Dep. at 42-44.)  Plaintiff claims Deputy Hoenig came to door and told him it was time to get on the bus.  Plaintiff said, "I'm not done eating," and asked Hoenig if he could take his food with him on the bus.  (*Id.*)  Hoenig replied, "No, you can't bring it on the bus," and told Plaintiff, "You've given up your right to eat.  Put the tray down and get on the bus." (Compl. at 11; Pl.'s Dep. at 43, 47.)  Plaintiff then claims to have "stepped back," and "started to shove stuff in [his] mouth real fast." (*Id.*)  However, Hoenig "went for," or "yanked on" the Styrofoam tray while Plaintiff was still trying to eat, and he admits he did not put the food down as Hoenig had ordered.  (Compl. at 11; Pl.'s Dep. at 47-48.)

At this point, Plaintiff claims Defendant Latimer partially entered the cell, and "yank[ed]" and "grabbed" him out into the hallway while the tray fell to the floor.  (Compl. at 11; Pl.'s Dep. at 49-50.)  Plaintiff was not hand or ankle-cuffed at the time Latimer pulled him out of the cell. (Compl. at 11; Pl.'s Dep. at 56.)

Latimer then "yanked [him] out and threw [him] against the wall."  (Compl. at 11; Pl.'s Dep. at 50-53, 57, 68,  83.)  While Plaintiff was facing the wall, Latimer ordered him to place his arms together high behind his back in an attempt to cuff his hands.  (*Id.*)  Before he placed Plaintiff's hands into cuffs, Plaintiff claims Latimer "goes off," and threatens to break Plaintiff's arm if he doesn't lift his arms higher.  (Compl. at 11; Pl.'s Dep. at 54, 66-67; Pl.'s Opp'n at 11.)

At this point, Plaintiff claims Latimer placed one of his wrists in the cuffs.  (Compl. at 11; Pl.'s Dep. at 54.)  Plaintiff claims Latimer put his second hand cuff on "the wrong way," with one hand facing up and one facing down, "contort[ing] [his] arm in painful and unnatural ways." (Compl. at 11; Pl.'s Dep. at 54-55; Opp'n at 11.)  Plaintiff claims because the cuffs were hinged and not chain-linked, one cuff rode up his arm and caused scarring on his right wrist. (Compl. at 11; Pl.'s Dep. at 55; Opp'n at 11.)

While still lined up against the wall next to the other detainees who were waiting to board the bus, Plaintiff claims Latimer and another deputy then "place[d] chains around his ankles." (Compl. at 11; Pl.'s Dep. at 58, 61.) Plaintiff claims Latimer was "leaning with his hand" against his back when Latimer or another deputy "yank[ed] up his second leg," which made him "slide down the wall." (Pl.'s Opp'n at 11; Pl.'s Dep. at 58, 61.) Plaintiff claims while "both [his] legs were in the air and Latimer was holding the chains that secured them, Latimer "taunted him by asking, "Now, what was that you were saying?" (Pl.'s Opp'n at 11.) Plaintiff next claims that after both his hands and legs were cuffed, Latimer "continued to throw him against the wall and the floor," despite the fact that he was "rendered immobile by Latimer's constant pressure on [Plaintiff's] back." Plaintiff claims Latimer finally "yanked [him] off the wall and … threw [him] probably four feet away" in a "Wrestle Mania" fashion. (Compl. at 11; Pl.'s Dep. at 62, 66.)

Plaintiff claims Latimer threw him to the floor "for no reason," because he was physically cooperating and was "fully restrained" by that time. (Pl.'s Opp'n at 11; Pl.'s Dep. at 66.) Plaintiff points to the videotaped footage of the incident to show that his legs "were secure before [he] was slam[m]ed to the floor" by Latimer. (Pl.'s Opp'n at 11.) Plaintiff claims when Latimer "slammed" him into the "texturized" floor on his "front part," he was unable to break his fall with his hands because they were cuffed behind him, so his chin hit the floor. (Compl. at 11; Pl.'s Dep. at 66, 69, Pl.'s Opp'n at 11.)

Plaintiff further alleges that while he was on the floor, and still "rendered immobile by Latimer's constant pressure on [his] back," Latimer "push[ed] his head against the floor with his body weight," "c[a]me[] down with his knees on [Plaintiff's] back," put his hand behind Plaintiff's head, and "slammed" his head against the floor "several times" until he "started to bleed from various areas of his face." (Compl. at 11-12; Pl.'s Dep. at 63, 69-70; Pl.'s Opp'n at 13.) While "pushing [his] head into the concrete several times," Plaintiff claims Latimer "mocked" and "chanted" next to his ear and "joked" to the deputies who were present, "Oh, look, he's bleeding." (Compl. at 12; Pl.'s Dep. at 70-71; Pl.'s Opp'n at 13.)

1    Next, Plaintiff claims Latimer picked him up off the floor and took him to the infirmary,

2 where he was seen by a nurse.  (Compl. at 12; Pl.'s Dep. at 71.)  Upon arrival, Plaintiff claims

3 Latimer continued "pushing" and threatening him in the presence of a nurse and an unidentified

4 sergeant, and challenged him to a fist fight, by "placing his face in close proximity to

5 [Plaintiff's] face."  (Pl.'s Dep. at 71-72; Compl. at 12; Opp'n at 13.)

6    Plaintiff next claims the nurse treated his wounds, but "due to the[ir] severity ... asked the

7 deputies to transfer [Plaintiff] to the University of California Medical Center for treatment."

8 (Compl. at 12; Pl.'s Dep. at 77.)  Plaintiff claims that Latimer instead "took [him] to a holding

9 cell and left him there until he was found by the next shift."  (Compl. at 12; Pl.'s Dep. at 77-78.)

10 Plaintiff was later transported to UCSD Medical Center by officers on the next shift, where he

11 received x-rays on his shoulder and wrist and stitches in his chin.  (Compl. at 12; Pl.'s Dep. at

12 79, 85-87.)

13    **C.**  **Defendants' Version of Events**

14    Defendant Latimer claims that on March 29, 2007, he was performing his duties as a

15 second floor "court bridge" deputy in the San Diego Central Jail.  (Defs.' Ex. 3 [hereafter

16 "Latimer Decl."] ¶ 2.)  A court bridge deputy's duties include receiving and processing inmates

17 from other jails, producing them in court, and receiving them back into the jail, feeding them and

18 coordinating their return to a bus which takes them back to the jail or other facility from which

19 they came.  (*Id.*)

20    At approximately 5:40 p.m., Latimer was lining up inmates in the transportation hallway

21 on the first floor of the Central Jail to board a bus to the George Bailey Detention Facility.  The

22 inmates had just completed their court appearances and had been given meals in Transfer

23 Holding Cell #1.  (*Id.* ¶ 3.)  As inmates exited the holding cell one by one, deputies scanned their

24 bar-coded wrist bands and lined them up facing the wall so that waist chains could be applied

25 prior to boarding the bus.  (*Id.*)

26    Latimer claims he twice overheard heard Deputy Hoenig tell Plaintiff, who was still

27 inside Holding Cell #1, to leave his food items inside the cell because it was time to board the

28 bus.  (*Id.* ¶ 4.)  Latimer claims he next saw Hoenig place a clipboard and another item on the

floor and reach into the holding cell to take the food from Plaintiff.  (*Id.* ¶ 5; Defs.' Ex. 4 at 17:36:38.)  Latimer then walked up to the cell and saw Hoenig had grasped Plaintiff's shirt sleeve.  Latimer claims he observed Plaintiff "twisting his body and pulling away." (Latimer Decl. ¶ 5.)

Latimer claims that at this point, Plaintiff was the only inmate out of 40 not lined-up in the hallway, and was delaying the transportation process by refusing to cooperate with Hoenig's instructions.  (*Id.* ¶ 6.)  Therefore, Latimer "reached into the holding cell, took hold of the front of [Plaintiff's] shirt, and pulled [him] out of the cell."  (*Id.* ¶ 7; Defs.' Ex. 4 at 17:36:38.)  Latimer claims he "walked" Plaintiff to the end of the hallway, about 10-12 feet away from the other inmates, "placed him up against the wall and instructed him to stay against the wall and not to move."  (Latimer Decl. ¶ 7.)  Latimer claims Plaintiff "did not comply with [his] instructions" and "immediately turned off of the wall and turned his face toward [him]." (*Id.*)

Latimer then "pushed [Plaintiff] back against the wall," "placed [his] right hand on the middle of [Plaintiff's] back," and "for the second time ... instructed [Plaintiff] to stay against the wall."  (*Id.* ¶¶ 8, 9.)  Latimer claims Plaintiff again "did not follow ... instructions," and "turned his face and body to the side so that he could see [Latimer] behind him."  (*Id.* ¶ 8.)  Latimer claims Plaintiff was complaining about not being able to finish his food.  (*Id.*)

Latimer admits that the "normal" procedure for transporting inmates on the bus is to place waist chains on them, which have handcuffs attached on each side of the inmate's body.  (*Id.* ¶ 9.)  Because Plaintiff was being "uncooperative," Latimer decided to "put separate handcuffs on [Plaintiff] until waist chains could be applied."  (*Id.*)  When Latimer "instructed [Plaintiff] to place his hands behind his back so [they] could handcuff him," Plaintiff "did not do so, but continued arguing."  (*Id.*)  Latimer then "grabbed [Plaintiff's] hands" and "placed [them] behind his back."  (*Id.*)

Latimer claims Deputy Hoenig then "attempted to place handcuffs on [Plaintiff], but he continued to resist" by "twisting his hands" and "not cooperating."  (*Id.* ¶ 10.)  Latimer "maintained a tight hold of [Plaintiff's] hands until Deputy Hoenig was able to place handcuffs on him."  (*Id.*)

After Plaintiff was handcuffed, Latimer walked Plaintiff down the hallway closer to the transfer sally port near the other inmates waiting to be loaded onto the bus. (*Id.* ¶ 11; Defs.' Ex. 4 at 17:37:39.) Latimer decided that while "not all inmates being transferred via bus are leg-chained," that Plaintiff required a "higher level of security measures" because he was "uncooperative" and "not following instructions." (Latimer Decl. ¶ 11.)

Latimer claims he twice instructed Plaintiff to "stay against the wall," but he "continued to turn his body off of the wall." (*Id.* ¶ 12.) Latimer claims Plaintiff also refused his order to raise his right foot, so Latimer "had to pull his right pant leg in order to bring [Plaintiff's] right foot up," so that another transportation deputy, Nielson, could place the leg chain on Plaintiff's right ankle. (*Id.* ¶¶ 11-12.)

After the cuff was placed on Plaintiff's right ankle, Latimer "kept constant pressure against [Plaintiff's] back to keep him on the wall," because Plaintiff "continued to try to come off [it]." (Id. ¶ 13.) Plaintiff then raised his left leg, so that Latimer and Nielson could attach the left ankle chain, but "began to move his foot in a manner that prevented Deputy Nielson from being able to attach the [left] chain." (Id. ¶ 13.) During this time, Latimer claims Plaintiff "was saying things to [him] and the other deputies," was "critical of the[ir] actions and continued to argue." (*Id.*)

Because Plaintiff was "becoming more and more difficult," and it was "clear that [Plaintiff] was not going to follow ... instructions," Latimer "decided to take [Plaintiff] to the ground to gain more effective control over him" and finish applying the leg chains. (*Id.* ¶ 14.) Latimer claims he "pulled down on the back of [Plaintiff's] shirt and brought him down to the ground," Deputy Nielson attached the second leg chain, and then they "lifted him back to his feet," and placed him back against the wall. (*Id.* ¶¶ 15-16.)

After Plaintiff was hand cuffed and leg chained, Latimer claims he "continued to be uncooperative," and was "obviously agitated." (*Id.* ¶ 16.) Latimer asserts Plaintiff "remained a possible threat to [him] in several ways." (*Id.*) Specifically, Latimer was "concerned that [Plaintiff's] behavior would incite the other inmates ... and to possibly cause a disturbance." (*Id.*) Latimer also claims he was required to "focus solely on [Plaintiff]" and this "made the

1   situation more dangerous." (*Id.*)  In addition, Latimer claims he had been previously "spit upon,

2   head-butted, and otherwise struck by inmates who have been handcuffed and leg-chained,"

3   therefore, he "knew that [Plaintiff] still posed a direct threat to [him] even though his movements

4   were limited." (*Id.*)

5       Thus, when Plaintiff continued to "refuse ... instructions to stay against the wall," by

6   "turn[ing] his head and part of his body to look behind him," Latimer "reacted by taking

7   [Plaintiff ] to the ground a second time." (*Id.*)  Latimer claims he had not "planned on taking

8   him down a second time; it was more of an automatic response," because "based on [his] training

9   and experience," he "knew [he] needed to put a stop to [Plaintiff's] behavior." (*Id.*)

10      Once Plaintiff was on the ground a second time, Latimer "placed [his] knee on

11  [Plaintiff's] back to maintain control of him on the grounds, but [] used minimal pressure." (*Id.*)

12  Latimer then "spoke to [Plaintiff] to make sure he was going to stop his uncooperative behavior,

13  then picked him back up." (*Id.*)  It was only after Latimer picked Plaintiff up from the ground

14  that he "noticed a spot of blood," and "realized that [Plaintiff's] chin was bleeding." (*Id.* ¶ 17.)

15      Latimer then "immediately" "brought [Plaintiff] to the medical unit for evaluation and

16  treatment." (*Id.* ¶¶ 17, 21; Defs.' Ex. 4 at 17:39:29.)  Latimer claims it is "common for [him]

17  to take the handcuffs off of an inmate in the medical unit, so the nurse can check his blood

18  pressure, pulse, etc." (Latimer Decl. ¶ 17.)  Latimer denies threatening Plaintiff or challenging

19  him to fight in the medical unit. (*Id.*)

20      After examining Plaintiff, Nurse Manalili determined that Plaintiff needed stitches for a

21  half-inch laceration to his chin, which required his transport to UCSD Medical Center. (*Id.* ¶

22  18.)  Latimer claims he notified the processing sergeant that Plaintiff required a transport to the

23  hospital and then back to the Central Jail. (*Id.*)  Latimer then took Plaintiff back to the first floor

24  and placed him in a holding cell where he would wait for the processing sergeant to arrange the

25  transport. (*Id.* ¶¶ 19, 20; Defs. Ex. 4 at 17:54:00.)

26      Latimer claims he had no further contact with Plaintiff, and that he "did not intend to

27  injure [him] by taking him to the ground. (*Id.* ¶¶ 20, 22.)

28

**IV.    Defendants' Motion For Summary Judgment**

        **A.    FED.R.CIV.P. 56 Standard of Review**

Summary judgment is proper where there is no genuine issue of material fact in dispute and the moving party has shown it is entitled to judgment as a matter of law. *Bias v. Moynihan*, 508 F.3d 1212, 1218 (9th Cir. 2007) (citing FED.R.CIV.P. 56(c)).

Under summary judgment practice, the moving party always bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any," which it believes demonstrate the absence of a genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (quoting FED.R.CIV.P. 56(c)); *Zoslaw v. MCA Distrib. Corp.*, 693 F.2d 870, 883 (9th Cir. 1982). The "purpose of summary judgment is to 'pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial.'" *Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986) (citations omitted).

If the moving party meets its initial responsibility, the burden then shifts to the nonmoving party to establish, beyond the pleadings, that there is a genuine issue for trial. *Celotex*, 477 U.S. at 324; *Bias*, 508 F.3d at 1218. To avoid summary judgment, the non-moving party is "required to present significant, probative evidence tending to support h[is] allegations," *Bias*, 508 F.3d at 1218 (citations omitted), and must point to some evidence in the record that demonstrates "a genuine issue of material fact [which], with all reasonable inferences made in the plaintiff[]'s favor, could convince a reasonable jury to find for the plaintiff[]." *Reese v. Jefferson School Dist. No. 14J*, 208 F.3d 736, 738 (9th Cir. 2000) (citing FED.R.CIV.P. 56; *Celotex*, 477 U.S. at 323); *see also Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). To "defeat a summary judgment motion ..., the non-moving party 'may not rest upon the mere allegations or denials' in the pleadings. FED.R.CIV.P. 56(e); *Berg v. Kincheloe*, 794 F.2d 457, 459 (9th Cir. 1986) (opposing party cannot rest solely on conclusory allegations of fact or law). Instead, the non-moving party "must establish the existence of a genuine factual dispute on the basis of admissible evidence; bare allegations without evidentiary support are insufficient to

survive summary judgment." *Estate of Tucker ex rel. Tucker v. Interscope Records, Inc.*, 515 F.3d 1019, 1033 n.14 (9th Cir. 2008).

However, the evidence of the opposing party is to be believed. *See Anderson*, 477 U.S. at 255; *Leslie v. Grupo ICA*, 198 F.3d 1152, 1159 (9th Cir. 1999) (The nonmoving party's declaration or sworn testimony "is to be accepted as true .... [The non-movant's] evidence should not be weighed against the evidence of the [movant].").  All reasonable inferences that may be drawn from the facts placed before the court must be drawn in favor of the opposing party. *See Matsushita*, 475 U.S. at 587; *Anderson*, 477 U.S. at 255).  At the summary judgment stage, "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge." *Anderson*, 477 U.S. at 255; *Dominguez-Curry v. Nevada Transp. Dep't*, 424 F.3d 1027, 1036 (9th Cir. 2005); *see also Hoover v. Switlik Parachute Co.*, 663 F.2d 964, 968 (9th Cir. 1981) (finding district court erred in granting summary judgment when the affidavits and other evidence raised credibility issues); *United States v. Two Tracts of Land in Cascade County, Montana*, 5 F.3d 1360, 1362 (9th Cir. 1993) (reversing district judge's decision to grant summary judgment based upon an assessment of nonmoving party's credibility).

## B.     Plaintiff's Objection to Admissibility of Deposition Testimony

In his Opposition to Defendants' Motion for Summary Judgment, Plaintiff objects to Defendants' reliance on his Deposition testimony, attached as Exhibit 1 to their Motion, because it is "incomplete and not admissible as evidence." (Pl.'s Opp'n at 9.)  Defendants do not address Plaintiff's objection in their Reply.

Rule 30(e) of the Federal Rules of Civil Procedure provides that

> (1) ... On request by the deponent or a party before the deposition is completed, the deponent must be allowed 30 days after being notified by the officer that the transcript or recording is available in which:
> (A) to review the transcript or recording; and
> (B) if there are changes in form or substance, to sign a statement listing the changes and the reasons for making them.

FED.R.CIV.P.30(e)(1) (West Rev. Supp. 2008).

1     Here, Plaintiff objects to Defendants' reliance on his deposition testimony on grounds

2     that while he "has a right to review[,] change and sign his deposition," he was not provided that

3     opportunity as Rule 30(e) provides.  Plaintiff claims he was deposed on March 27, 2009, but the

4     transcript was not "delivered" to him until April 21, 2009 and "entered into evidence in ...

5     Defendants' motion on the same day."  (Pl.'s Opp'n at 9.)  Plaintiff claims that because he did

6     not have 30 days to review, change and sign the deposition transcript, "it cannot be used as

7     factual evidence" in support of summary judgment.  (*Id.*)

8     Plaintiff's objection is well-taken.  Both he and counsel for Defendants stipulated at the

9     close of his deposition testimony that the court reporter would prepare the transcript, copy it and

10    mail a copy to him within 10 business days, so that he would have "30 days to review that

11    transcript, make any changes ... and sign [it] under penalty of perjury."  (Defs.' Ex. 1, Pl.'s Dep.

12    at 91-92.)  Plaintiff claims, however, he did not receive a copy until April 21, 2009–the same day

13    it was included as an exhibit in support of summary judgment.  (Pl's Opp'n at 9.)  In fact, the

14    deposition transcript offered by Defendants is not signed by Plaintiff, and they have failed to

15    counter Plaintiff's objection in their Reply.

16     Accordingly, Plaintiff's objection is sustained.  The Court further finds, however, that it

17    need not rely on Plaintiff's deposition testimony in order to rule on the motion for summary

18    judgment.  While Plaintiff's deposition testimony makes specific some factual allegations

19    underlying Plaintiff's claims, the sworn statement attached to Plaintiff's Complaint, as well as

20    the two additional sworn statements Plaintiff has submitted in opposition to Defendants' Motion,

21    Defendants' affidavits and the video recording of the incident are sufficient to raise a genuine

22    issue of material fact for trial.  *See Chambers v. Santa Barbara Chamber of Commerce*, 705 F.2d

23    1515, 1521 (9th Cir. 1983); *see also California Pro-Life Council v. Randolph*, 507 F.3d 1172,

24    1176 (9th Cir. 2007) ("'A verified complaint may serve as an affidavit for purposes of summary

25    judgment if  [1] it is based on personal knowledge and if [2] it sets forth the requisite facts with

26    specificity.'") (quoting *Moran v. Selig*, 447 F.3d 748, 760 n.16 (9th Cir. 2006) (citation

27    omitted)).

28

## C.   Defendants' Arguments

Defendants seek summary judgment on the following grounds:  (1) no genuine issues of material fact exist to show that Deputy Latimer used excessive force; 2) even if Deputy Latimer used excessive force, he is entitled to qualified immunity for any damages Plaintiff seeks because a reasonable deputy in his position would not know that his actions violated clearly established law; 3) no evidence in the record supports Plaintiff's deliberate indifference to serious medical needs claim; and 4) no genuine issues of material fact exist to show that any County of San Diego custom, policy or practice caused a violation of Plaintiff's constitutional rights.  (*See* Defs.' Mem. of P&As in Support of Mot. for Summ. J. [Doc. No. 28-2] at 9-19.)

### 1.   Plaintiff's Pre-trial Status

As preliminary matter, the Court notes that Plaintiff's Complaint alleges Defendants violated his right to be free from "cruel and unusual punishment" by using excessive force and acting with "deliberate indifference" to his medical needs.  (Compl. at 3-4). Defendants also apply Eighth Amendment standards to Plaintiff's claims.  (*See* Defs.' Mem. of P&As in Supp. of Mot. for Summ. J. at 11-13.)  However, Plaintiff was arrested in September 2006, and thus, was a pre-trial detainee on March 29, 2007.  (Pl.'s Dep. at 12.)  Plaintiff was not convicted until he pleaded guilty approximately six months after the incident.  (*Id.* at 41-42.)

### 2.   Excessive Force Claims Against Defendant Latimer

The Eighth Amendment's prohibition against the "malicious or sadistic" use of force, *see Hudson v. McMillian*, 503 U.S. 1, 7 (1992), does not apply "until after conviction and sentence." *Graham v. Connor*, 490 U.S. 386, 392 n.6 (1989).

Pretrial detainees, on the other hand, are protected by substantive due process, and may also challenge the use of force against them under the Fourteenth Amendment if that force is so excessive that it amounts to punishment.  *Bell v. Wolfish*, 441 U.S. 520, 535 (1979) ("[U]nder the Due Process Clause, a detainee may not be punished prior to an adjudication of guilt in accordance with due process of law."); *see also Jones v. Blanas*, 393 F.3d 918, 932 (9th Cir. 2004) ("The more protective fourteenth amendment standards apply to conditions of confinement when detainees ... have not [yet] been convicted of a crime.") (citation omitted).

Thus, pretrial detainees, "retain at least those constitutional rights that we have held are enjoyed by convicted prisoners." *Bell*, 441 U.S. at 545; *Redman v. County of San Diego*, 942 F.2d 1435, 1441 (9th Cir. 1991) (en banc). "Absent a showing of an express intent to punish, whether a particular action taken by jail officials amounts to punishment 'generally will turn on whether an alternative purpose to which [the action or restriction] may rationally be connected is assignable for it, and whether it appears excessive in relation to the alternative purpose assigned [to it].'" *White v. Roper*, 901 F.2d 1501, 1504 (9th Cir. 1990) (quoting *Bell*, 441 U.S. at 538.)

Following *Bell*, the Ninth Circuit has recognized that "punitive conditions may be shown (1) where the challenged restrictions [or actions] are expressly intended to punish, or (2) where the challenged restrictions [or actions] serve an alternative, non-punitive purpose, but are nonetheless 'excessive in relation to the alternative purpose,' or 'are employed to achieve objectives that could be accomplished in so many alternative and less harsh methods.'" *Jones*, 393 F.3d at 932 (internal citations omitted).

Thus, if an official's action is "reasonably related to a legitimate government objective," it will not "without more, constitute punishment." *White,* 901 F.2d at 1504 (citing *Bell*, 441 U.S. at 539). "Legitimate, non-punitive government interests include ensuring a detainee's presence at trial, maintaining jail security, and effective management of a detention facility." *Jones*, 393 F.3d at 932 (citations omitted). However, "retribution and deterrence are not legitimate nonpunitive governmental objectives." *Bell*, 441 U.S. at 539 n.20; *White*, 901 F.2d at 1504-05.

Where the alleged act of "punishment" specifically involves an official's use of force against a pre-trial detainee, the Ninth Circuit has required lower courts to "balance several factors focusing on the reasonableness of the officer's actions given the circumstances." *White*, 901 F.2d at 1507 (citing *Smith v. City of Fontana*, 818 F.2d 1411, 1417 (9th Cir. 1987)). These factors, like those applicable under the Eighth Amendment, include "(1) the need for the application of force, (2) the relationship between the need and the amount of force that was used, (3) the extent of the injury inflicted, and (4) whether the force was applied in a good faith effort

1  to maintain and restore discipline." *Id.* (citations omitted); *cf. Hudson*, 503 U.S. at 7

2  (considering same four factors under Eighth Amendment excessive force analysis).[3]

3        In sum, the physical application of force against a person in custody, whether it be

4  through brute strength, chemical or other weaponry, or mechanical restraint, may not be

5  excessive. *See Whitley*, 475 U.S. at 312. "That is not to say that every malevolent touch by a

6  prison guard gives rise to a federal cause of action." *Hudson*, 503 U.S. at 10 (citing *Johnson v.*

7  *Glick*, 481 F.2d 1028, 1033 (2d Cir. 1973) ("Not every push or shove, even if it may later seem

8  unnecessary in the peace of a judge's chambers, violates a prisoner's constitutional rights.")).

9        First, there is no genuine dispute that Defendant Latimer's need to ensure the security of

10  detainees and Sheriff's Department personnel while moving multiple detainees from jail to court

11  and back is a legitimate and non-punitive governmental interest. *Jones*, 393 F.3d at 932; *see*

12  *also* Defs.' Ex. 5, Decl. of Christopher Cross ¶¶ 5-6. Nor does the record reveal any material

13  dispute as to whether Plaintiff was initially non-compliant when ordered by Deputy Hoenig to

14  leave his food tray in the holding cell and enter the hallway for processing onto the bus. (Compl.

15  at 11; Pl.'s Dep. at 42-28; Latimer Decl. ¶¶ 4-5.)

16        However, as soon as Latimer removed Plaintiff from the holding cell, the material facts

17  concerning both Latimer's need to use force and the relationship between the need and the

18  amount of force used to ensure Plaintiff's compliance are in dispute. *See Bell*, 441 U.S. at 535;

19  *Jones*, 393 F.3d at 932. Specifically, Plaintiff swears, under penalty of perjury in sworn

20  statements attached to both his Complaint and his Opposition, that Latimer "yanked," "grabbed,"

21  "threw" him against the wall and threatened to break him arm while attempting to place hand

22  cuffs on him. (Compl. at 11; Pl.'s Dep. at 54, 66-67; Pl.'s Opp'n at 11.) Plaintiff further claims

23  while he was faced up against the wall and immobile due to the pressure Latimer was placing

24        [3] The Ninth Circuit has noted that while different Constitutional provisions may be applied
25  dependent on whether a plaintiff's claim arise before or after conviction, a "pretrial detainees' rights
under the Fourteenth Amendment are comparable to prisoners' rights under the Eighth Amendment,"
and therefore, "the same standards apply." *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998); *but cf.*
26  *Gibson v. County of Washoe*, 290 F.3d 1175, 1188 n.10 (9th Cir. 2002) (noting that while the Court
generally looks to Eighth Amendment cases when reviewing conditions of confinement claims raised
27  by pretrial detainees under the Fourteenth Amendment, "[i]t is quite possible ... that the protections
provided pretrial detainees by the Fourteenth Amendment in some instances exceed those provided
28  convicted prisoners by the Eighth Amendment."); *see also Lolli v. County of Orange*, 351 F.3d 410, 419
n.6 (9th Cir. 2003) (quoting *Gibson*, 290 F.3d at 1188 n.10).

on his back, Latimer "contorted [his] arm in painful and unnatural ways," and with the help of another deputy "yanked" both his legs off the ground while they were in ankle chains and taunted him as he slid to the ground. (Compl. at 11; Pl.'s Dep. at 58-62; Pl.'s Opp'n at 11.) *After* he was "fully restrained" in both hand and ankle cuffs, Plaintiff claims Latimer "yanked" him off the wall "for no reason" and "slammed" him to the ground a second time. (Compl. at 11; Pl.'s Dep. at 66; Pl.'s Opp'n at 11.) Once on the ground, Plaintiff further testifies Latimer "came down with his knees" on Plaintiff's back, "slammed" his head against the floor several times, and "joked" and "mocked" to the other deputies when he realized Plaintiff was bleeding. (Compl. at 11-12; Pl.'s Dep. at 63, 69-71; Pl.'s Opp'n at 13.)

Deputy Latimer has also submitted a sworn declaration, in which he testifies he merely "walked" Plaintiff down a hallway and "placed" him against a wall.  (Latimer Decl. ¶ 7.) Latimer further claims he continually instructed Plaintiff to stay against the wall, but Plaintiff was noncompliant and "immediately" and continually kept turning his head.  (*Id.* at ¶¶ 7-9.) Latimer claims that Plaintiff's resistant behavior required the assistance of two other deputies and justified the use of both hand and ankle cuffs under the circumstances.  (*Id.* ¶¶ 9-13.) Latimer specifically admits pulling down on the back of Plaintiff's shirt in order to bring hin to the ground the first time in order to "gain more effective control" over him and to assist Deputy Nielson in his effort to finish applying Plaintiff's leg chains. (*Id.* ¶¶ 13-14.) *After* Plaintiff was cuffed and chained, however, Latimer claims he "continued to be uncooperative," was "obviously agitated," and continually refused Latimer's instructions to "stay against the wall." (*Id.* ¶ 16.)  For these reasons, and because Latimer claims he had previously been spit-upon, head-butted and otherwise struck by inmates whose movements were limited, Latimer "reacted by taking [Plaintiff] to the ground a second time."  (*Id.* ¶ 17.)  Latimer claims he did so as an "automatic response," because he perceived that Plaintiff "remained a "possible" and "direct" threat insofar as his behavior could incite other inmates.  (*Id.*)  Latimer expressly denies intending to injure Plaintiff by taking him to the ground, and claims if Plaintiff has complied with instructions "no force would have been used on him at all." (*Id.* ¶ 22.)

Based on this contradictory testimony, the Court finds that genuine issues of material fact exist as to whether Deputy Latimer use of force under the circumstances was justified, or instead, was so excessive that it amounted to punishment. *Bell*, 441 U.S. at 535; *Jones,* 393 F.3d at 934.   A rational trier of fact could believe either that Deputy Latimer's actions were "punitive," *i.e.*, that they were excessive in to relation to a legitimate need to ensure jail security, *id.*, or that they constituted a reasonable and appropriate response to the threat Plaintiff posed. *Id.; see also Anderson*, 477 U.S. at 255 (at summary judgment "[c]redibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge.").

Accordingly, because conflicting factual accounts of the altercation, in particular the amount of force Latimer used and Plaintiff's degree of compliance, reveal genuine issue of material fact, the Court DENIES Defendants' Motion for Summary Judgment as to Plaintiff's excessive force claim against Deputy Latimer.

### 3.   Inadequate Medical Care Claims

Defendants further argue they are entitled to judgment as a matter of law as to Plaintiff's inadequate medical care claims.  (Defs.' P&A's at 14-17.)  Specifically, Defendants claim "no one at [the] Jail was deliberately indifferent to Plaintiff's serious medical needs, and any delay did not make his injury any worse."  (*Id.* at 14.)

As with Plaintiff's excessive force claims, it is the Fourteenth Amendment's substantive due process clause which governs his medical care claim.  *See Conn v. City of Reno*, 572 F.3d 1047, 1054 (9th Cir. 2009).  However, unlike Plaintiff's excessive force claims, the Court finds no genuine issues of material fact demand a trial on this ground.[4]  *See Celotex*, 477 U.S. at 324.

---

[4]      While a pre-trial detainee's medical care claims also arise under the due process clause of the Fourteenth Amendment rather than the Eighth Amendment prohibition against cruel and unusual punishment, *see Bell*, 441 U.S. at 535 n.16; *Redman v. County of San Diego*, 942 F.2d 1435, 1440, n.7 (9th Cir. 1991), a pre-trial detainee's due process rights are "at least as great" as the Eighth Amendment protections available to convicted prisoners. *Maddox v. Los Angeles*, 792 F.2d 1408, 1414 (9th Cir. 1986); *see also Lolli v. County of Orange*, 351 F.3d 410, 419 n.6 (9th Cir. 2003) (noting, but refusing to consider, question of whether a pretrial detainee's medical care claims, analyzed under the Eighth Amendment's deliberate indifference standards, were entitled to *more* protection than those of a convicted prisoner under the cruel and unusual punishments clause).

The Eighth Amendment protects inmates from cruel and unusual punishment, which includes the denial of medical care. *Estelle v. Gamble*, 429 U.S. 97, 102-03 (1976). Pretrial detainees like Plaintiff, however, are protected under the Due Process Clause of the Fourteenth Amendment. *Conn*, 572 F.3d at 1054 (citing *Oregon Advocacy Ctr. v. Mink*, 322 F.3d 1101, 1120 (9th Cir. 2003)). Although courts have "borrowed from Eighth Amendment jurisprudence in giving shape to pretrial detainees' substantive due process rights," *id.* (citing *Frost v. Agnos*, 152 F.3d 1124, 1128 (9th Cir. 1998)), that amendment establishes only "a minimum standard of care." *Id.* (citing *Mink*, 322 F.3d at 1120).

Both the Eighth and the Fourteenth Amendments, however "guarantee that inmates and detainees receive constitutionally adequate medical and mental health care." *Id.* (citing *Doty v. County of Lassen*, 37 F.3d 540, 546 (9th Cir. 1994)). If an official is deliberately indifferent to a "substantial risk of serious harm to an inmate–including the deprivation of a serious medical need"– he violates the Eighth Amendment, as well as the Fourteenth Amendment. *Id.* at 1054-55 (citing *Farmer v. Brennan*, 511 U.S. 825, 828 (1994); *Frost*, 152 F.3d at 1128) & n.3 (concluding that court need not "further explicate ... the more lenient but amorphous test under the Fourteenth Amendment" if genuine issues of material fact preclude summary judgment under the Eighth Amendment's deliberate indifference standard)).

Thus, to set forth a constitutional claim predicated upon the failure to provide medical treatment,

> [f]irst, the plaintiff must show a "serious medical need" by demonstrating that "failure to treat a prisoner's condition could result in further significant injury or the 'unnecessary and wanton infliction of pain.' " Second, the plaintiff must show the defendant's response to the need was deliberately indifferent.

*Jett v. Penner*, 439 F.3d 1091, 1096 (9th Cir.2006) (internal citations omitted). The second prong requires both "(a) a purposeful act or failure to respond to a prisoner's pain or possible medical need and (b) harm caused by the indifference." *Id.* Deliberate indifference thus requires an objective risk of harm and a subjective awareness of that harm. *Farmer*, 511 U.S. at 837; *Conn*, 572 F.3d at 1055.

1       Here, Defendants have shown no genuine issues of material fact exist to support

2   Plaintiff's inadequate medical care claims. *Celotex*, 477 U.S. at 323. While the evidence in the

3   record does show Plaintiff's wounds were sufficiently serious to require an out-of-jail transport

4   to UCSD where he received stitches to his chin, *see* Compl. at 12; Pl.'s Dep. at 77; Latimer Decl.

5   ¶ 18, no rational jury could find either Deputy Latimer or the County of San Diego acted with

6   "deliberate indifference" in response to his need. *See Conn*, 572 F.3d at 1055.

7       The only evidence in the record shows that "immediately" or very soon after Plaintiff was

8   injured, Deputy Latimer picked Plaintiff up off the ground and took him to the infirmary, where

9   his wounds were examined, their severity assessed and arrangements to transport to UCSD were

10  commenced. (Compl. at 12; Pl.'s Dep. at 77; Latimer Decl. ¶¶ 17-20.) While Plaintiff does

11  allege to have been placed in a holding cell, "until the next shift," (Compl. at 12; Pl.'s Dep. at

12  77-78), absolutely nothing in the record suggests anyone acted with deliberate indifference to

13  Plaintiff's serious need or that he was harmed by any delay in getting him to UCSD. *See*

14  *McGuckin v. Smith*, 974 F.2d 1050, 1060 (9th Cir. 1992), *overruled on other grounds by WMX*

15  *Techs., Inc. v. Miller*, 104 F.3d 1133 (9th Cir. 1997) (en banc). In fact, the DVD submitted by

16  Defendants shows Plaintiff being taken to the ground for the second time by Defendant Latimer

17  at 17:37:39, Latimer "walking [Plaintiff] to medical" approximately two minutes later at

18  17:39:29, Plaintiff being escorted from medical to a holding cell at 17:54:00, and another deputy

19  "taking [Plaintiff] out of the holding cell and walking him down the hallway for transport to the

20  hospital" at 18:59:22–just a little more than one hour after he was injured. (Defs.' Ex. 4; Latimer

21  Decl. ¶¶ 17-20; 25.)

22      Accordingly, Defendants' Motion for Summary Judgment as to Plaintiff's inadequate

23  medical care claims is GRANTED.[5]

24

25

26

27      _____

     [5] Because the Court finds no triable issues exist as to Plaintiff's inadequate medical care claim
    against Defendant Latimer, it need not further determine whether Latimer is also entitled to qualified

28  immunity as to this claim. *Saucier*, 533 U.S. at 201 ("If no constitutional right would have been
    violated were the allegations established, there is no necessity for further inquiries concerning qualified
    immunity."); *see also Haynie v. County of Los Angeles*, 339 F.3d 1071, 1078 (9th Cir. 2003).

### 4.      Qualified Immunity – Defendant Latimer

Even if Latimer did violate Plaintiff's Fourteenth Amendment rights by using excessive force against him, Latimer claims he is nevertheless entitled to qualified immunity from any damages Plaintiff seeks because "any reasonable deputy may have taken the same action." (Defs.' P&A's in Supp. of Summ. J. at 12.)

"Government officials enjoy qualified immunity from civil damages unless their conduct violates 'clearly established statutory or constitutional rights of which a reasonable person would have known.'" *Jeffers v. Gomez*, 267 F.3d 895, 910 (9th Cir. 2001) (quoting *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). When presented with a qualified immunity defense, the central questions for the court are: (1) whether the facts alleged, taken in the light most favorable to Plaintiff, demonstrate that the Defendant's conduct violated a statutory or constitutional right; and (2) whether the right at issue was "clearly established" at the time it is alleged to have been violated. *Saucier v. Katz*, 533 U.S. 194, 201 (2001). Although *Saucier* originally required the Court to answer these questions in order, the U.S. Supreme Court has recently held that "while the sequence set forth there is often appropriate, it should no longer be regarded as mandatory." *Pearson v. Callahan*,__U.S. __, 129 S.Ct. 808, 818 (2009).

If the Court finds that Plaintiff's allegations do not make out a statutory or constitutional violation, "there is no necessity for further inquiries concerning qualified immunity." *Saucier*, 533 U.S. at 201. Similarly, if the Court determines that the right at issue was not clearly established at the time of the defendant's alleged misconduct, the court may end further inquiries concerning qualified immunity without determining whether the allegations in fact make out a statutory or constitutional violation. *Pearson*, 129 S.Ct. at 818.

In this case, the Court has found genuine issues of material fact exist as to whether Defendant Latimer violated Plaintiff's Fourteenth Amendment rights by using excessive force. *See Bell*, 441 U.S. at 535; *Jones,* 393 F.3d at 934. Thus, "the next, sequential step is to ask whether the right was clearly established." *Saucier*, 533 U.S. at 201.

A right is "clearly established" when its contours are "sufficiently clear that a reasonable official would understand that what he is doing violates that right." *Id.* at 202. This does not

mean "that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful." *Hope v. Pelzer*, 536 U.S. 730, 739 (2002). Instead, "in the light of pre-existing law[,] the unlawfulness must be apparent." *Id.* The "salient question" is whether the state of the law at the time gives officials "fair warning" that their conduct is unconstitutional. *Id.* at 740. "This inquiry ... must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 202; *Crowell v. City of Coeur D'Alene*, 339 F.3d 828, 846 (9th Cir. 2003). Indeed, "'[o]fficials can still be on notice that their conduct violates established law even in novel factual circumstances.'" *Hope*, 536 U.S. at 741. In order to find that the law was clearly established, then, the court "need not find a prior case with identical, or even 'materially similar,' facts." *Flores v. Morgan Hill Unified Sch. Dist.,* 324 F.3d 1130, 1136-37 (9th Cir. 2003) (quoting *Hope,* 536 U.S. at 741).

The Ninth Circuit has specifically noted that "a prison guard's use of excessive force was clearly established" by 1992 when the Supreme Court held that the "settled rule [is] that 'the unnecessary and wanton infliction of pain ... constitutes cruel and unusual punishment forbidden by the Eighth Amendment.'" *Martinez v. Stanford*, 323 F.3d 1178, 1184 (9th Cir. 2003) (quoting *Hudson*, 503 U.S. at 5). Indeed, *Hudson* held unconstitutional an unjustified use of physical force upon a non-resistant prisoner. *See Hudson*, 503 U.S. at 7-10 (holding that guards violated Hudson's Eighth Amendment rights when they gratuitously punched and hit him, causing only minor injuries, while escorting him between prison facilities). The Ninth Circuit has similarly found, in the case of a pre-trial detainee alleging excessive force, that "by 1985, the law of this Circuit would have put a reasonable officers on notice that an 'unprovoked and unjustified attack" violates clearly established constitutional rights. *Lolli v. County of Orange*, 351 F.3d 410, 421-22 (9th Cir. 2003) (citing *Felix v. McCarthy*, 939 F.2d 699, 701-02 (9th Cir. 1991)). Indeed, in *Lolli*, the Ninth Circuit found the genuine issues of facts as to the amount of force used against a pretrial detainee who claimed to have been "handcuffed before the beating stopped and ... kicked, hit or twisted about 10 times after he was cuffed," precluded the district court's finding of qualified immunity. *Id.* at 412, 415, 421-22.

Defendant Latimer claims he is entitled to qualified immunity because "[a] reasonable deputy in position would not know that taking Plaintiff to the ground was unlawful." (Defs.' P&As at 12.)  Latimer argues, in other words, that although the evidence in the record taken in the light most favorable to Plaintiff may show that the force he used against Plaintiff violated his Fourteenth Amendment rights,  his mistake was reasonable because his supervisor and a Sheriff's Department defensive tactics instructor "believe that [his] actions were appropriate and fell within the Department's policies and procedures," and he "had no intent to injur[e] Plaintiff." (*Id.* at 14.)

As discussed above however, Plaintiff has, in three separate statements sworn under penalty of perjury, as well as in his deposition testimony, claimed that he was thrown against a wall, roughly hand-cuffed, threatened with arm-breaking and then ankle-chained because he initially refused to stop eating a meal before boarding a bus.  More importantly, Plaintiff claims he complied with Latimer's orders to stay against the wall, and *after* he was "fully restrained" in both ankle cuffs and leg chains, was "slammed" to the ground with enough force to break open his chin "for no reason."  (Compl. at 11; Pl.'s Dep. at 50-69; Opp'n at 11.)  If a jury were to find these facts true, no reasonable officer in Defendant Latimer's position could have believed such force was lawful.  *See Lolli*, 351 F.3d at 421-22; *see also Martinez*, 323 F.3d at 1180, 1184 (finding qualified immunity improperly granted where "much of the evidence supporting [the plaintiff's] version of the facts, [and] directly contradicted the officers.").

According, the Court DENIES Defendant Latimer's Motion for Summary Judgment based on claims of qualified immunity.

### 5. Municipal Liability

Finally, the County of San Diego seeks summary judgment on grounds that Plaintiff has failed to identify, and no evidence in the record exists to show, that any municipal policy or procedure related to either the use of force or inmate medical care is unlawful or unconstitutional.  (Defs.' Mem. of P&As in Supp. of Summ. J. at 18-19.)  The Court agrees.

"[A] municipality cannot be held liable solely because it employs a tortfeasor – or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory."

1   *Monell v. Department of Social Services*, 436 U.S. 658, 691 (1978); *Gibson v. County of*

2   *Washoe*, 290 F.3d 1175, 1185 (9th Cir. 2002).   A municipality may be liable under § 1983 for

3   monetary, declaratory, or injunctive relief where the constitutional deprivation was caused by

4   the implementation or execution of "a policy statement, ordinance, regulation, or decision

5   officially adopted and promulgated by that body's officers." *Monell*, 436 U.S. at 690; *Board of*

6   *the County Commissioners v. Brown*, 520 U.S. 397, 402-04 (1997); *Navarro v. Block*, 72 F.3d

7   712, 714 (9th Cir. 1995).

8       To establish municipal liability, plaintiff must show:   (1) he was deprived of a

9   constitutional right;  (2) the city had a policy; (3) the policy amounted to deliberate indifference

10  to plaintiff's constitutional right;  and (4) the policy was the "moving force behind the

11  constitutional violation." *Van Ort v. Estate of Stanewich*, 92 F.3d 831, 835 (9th Cir. 1996);

12  *Brown*, 520 U.S. at 402-04; *Trevino v. Gates*, 99 F.3d 911, 918 (9th Cir. 1996).  Thus, municipal

13  liability depends in part, on the showing of a "causal link between the municipal action and the

14  deprivation of federal rights." *Brown*, 520 U.S. at 402-04; *Monell*, 436 U.S. at 691; *Gibson*, 290

15  F.3d at 1185-87.

16      In this case, the Court has found triable issues of fact only as to Plaintiff's excessive force

17  claim against Defendant Latimer, but no evidence in the record–nor even any allegation in

18  Plaintiff's Complaint–to suggest Latimer's actions were "caused by" an custom, policy or

19  practice of the County of San Diego.  *See Monell*, 436 U.S. at 694; *Brown,* 520 U.S. at 405

20  (noting that "[w]here a plaintiff claims that the municipality has not directly inflicted injury, but

21  nonetheless has caused an employee to do so, rigorous standards of culpability and causation

22  must be applied to ensure that the municipality is not held liable for the actions of its

23  employee.").

24      Here, Plaintiff specifically premises the gravamen of this action on the acts of an

25  individual Sheriff deputy's application of force against him on a particular occasion.  A plaintiff

26  cannot demonstrate the existence of a municipal policy or custom based solely on a "single

27  occurrence of [allegedly] unconstitutional action by a non-policymaking employee." *McDade*

28  *v. West*, 223 F.3d 1135, 1141 (9th Cir. 2000).

1    Thus, the Court finds no genuine issues of material facts exist to support a municipal

2   liability claim against the County of San Diego.  Thus, the County is entitled to summary

3   judgment as a matter of law pursuant to FED.R.CIV.P. 56.

4   **V.      Conclusion and Order**

5       For all the reasons set forth herein, IT IS HEREBY ORDERED that:

6       1)   Plaintiff's claims against Deputy Hoenig are DISMISSED for failure to prosecute

7            and for failure to state a claim upon which relief can be granted pursuant to

8            FED.R.CIV.P. 4(m), 28 U.S.C. §§ 1915(e)(2) and 1915A(b);

9       2)   Defendant Latimer's Motion for Summary Judgment is GRANTED as to

10           Plaintiff's inadequate medical care claims and DENIED as to Plaintiff's excessive

11           force claims; and

12      3)   Defendant County of San Diego's Motion for Summary Judgment is GRANTED.

13

14

15   **DATED:  August 28, 2009**

16

17   **IRMA E. GONZALEZ, Chief Judge**
     **United States District Court**

18

19

20

21

22

23

24

25

26

27

28